UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY

**FILED**

JAMES J. WALDRON, CLERK

September 1, 2005

U.S. BANKRUPTCY COURT
CAMDEN, N.J.
BY: /s/Danita Johnson, Deputy

_____
                       :

IN RE:                   :     CHAPTER 11
                       :

NICKELS MIDWAY PIER, LLC,    :     CASE NO. 03-
                            49462 (GMB)
                       :

             DEBTOR.    :

                       :     <u>MEMORANDUM OPINION</u>
_____

APPEARANCES:        Frederic R. Cohen, Esquire
                     Sherman, Silverstein, Kohl, Rose & Podolsky, P.A.
                     4300 Haddonfield Road, Suite 311
                     Pennsauken, NJ 08109
                     Attorney for Debtor

                     Michael A. Zindler, Esquire
                     Teich Groh
                     691 State Highway 33
                     Trenton, NJ 08619
                     Attorney for Debtor

                     Arthur J. Abramowitz, Esquire
                     Cozen O'Connor
                     457 Haddonfield Road, Suite 300
                     Cherry Hill, NJ 08002
                     Attorney for Wild Waves, LLC

                     Willis F. Flower, Esquire
                     Ford, Flower & Hasbrouck
                     Central Square, Box 405
                     Linwood, NJ 08221
                     Attorney for Wild Waves, LLC

Before the Court is Debtor, Nickels Midway Pier, LLC's ("Nickels"), motion to reject

executory contract, pursuant to 11 U.S.C. § 365.  A hearing on this matter was held on August 9,

2005.

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(a) and 157(a),

and the Standing Order of the United States District Court for the District of New Jersey dated

July 23, 1984, referring all bankruptcy cases to the bankruptcy court.  This is a core proceeding

pursuant to 28 U.S.C. § 157(b)(2)(A).  Venue of this case is proper in the District of New Jersey

pursuant to 28 U.S.C. §§ 1408 and 1409.  The following shall constitute findings of fact and

conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.

## I.    FACTUAL BACKGROUND

Nickels Midway Pier, LLC is in the business of purchasing, leasing and managing real

estate.  Nickels owns two pieces of property in Wildwood, New Jersey.  At issue in this case is a

pier (the "Pier") located at 3500 Boardwalk, Wildwood, New Jersey.  Nickels purchased the Pier

in November of 1976.  In 1999, Nickels and Wild Waves, LLC ("Wild Waves") entered into a

written lease agreement, whereby Wild Waves would lease 70 percent of the Pier for the purpose

of constructing and operating a water park.  Wild Waves asserted that the written lease was part

of an agreement to sell the pier.  Wild Waves constructed new concrete foundations and made

other improvements to the property for the purpose of constructing a water park.  Wild Waves

has been operating its water park on the Pier since 2000.  On the remaining 30 percent of the Pier

are located several buildings and kiosks leased to a variety of tenants on the boardwalk.

The parties disagreed on the issue of whether Nickels had agreed to sell the Pier to Wild

Waves.  Wild Waves asserted that Nickels agreed orally to sell it the Pier, while Nickels argued

that it never entered into an agreement to sell the Pier and that Wild Waves merely held a

leasehold interest in the portion of the Pier occupied by the water park.  Neither party completed

performance of the alleged sale contract; i.e., Wild Waves did not furnish a deposit or the

2

purchase price, and Nickels did not deliver the deed.

In 2001, Nickels initiated a civil action in the New Jersey Superior Court, Chancery Division and Wild Waves filed counterclaims prior to the filing of the bankruptcy. Wild Waves' counterclaim sought a determination that an oral contract for the sale of the Pier existed between the parties. A trial in that matter commenced on December 3, 2003.

On December 8, 2003, Nickels filed for chapter 11 bankruptcy and on December 16, 2003, Nickels filed a motion to reject its lease with Wild Waves, pursuant to 11 U.S.C. § 365. Subsequently, Wild Waves filed a motion for stay relief for the purpose of pursuing its counterclaim in the Chancery Division. On February 20, 2004, the Court granted Wild Waves' motion for stay relief and reserved its decision on whether Nickels could reject Wild Waves' lease until resolution of the state court litigation.

The parties tried their state court litigation before Judge Seltzer in the Chancery Division on December 3 and 4, 2004, February 7, 8, and 9, 2005, and on March 1, 2005. On April 25, 2005, Judge Selzter entered an order declaring that

> Nickels Midway Pier, LLC and Wild Waves, LLC entered into a binding Agreement respecting Nickels Midway Pier, pursuant to which Wild Waves was to lease a portion of the Pier pursuant to a Business Lease dated May 15, 1999 and then to purchase the entire Pier in accordance with the terms contained in a written (but unexecuted) Agreement of Sale accepted into evidence as D-21.

Judge Seltzer determined the purchase price of the Pier in 2003 to be $5,500,000.00. Currently, Nickels has received offers to purchase the Pier for $15,000,000.00 and $15,400,000.00, which included various conditions.

Upon resolution of the state court litigation, on July 25, 2005, the debtor sought to proceed with its motion to reject the executory contract filed December 16, 2003. Wild Waves

3

filed an objection to Nickels' motion to reject and Nickels filed a response thereto on August 1, 2005.  On July 28, 2005, the Court held a pre-trial conference with the parties, at which it determined that it would consider the following issues at the August 9, 2005 hearing: (1) whether the Agreement of Sale (the "Agreement") was an executory contract; (2) if so, whether Nickels satisfied the business judgment test when it decided to reject the Agreement; and (3) if Nickels may reject the Agreement, whether Wild Waves is "in possession" of the Pier under § 365(i).  A plenary hearing was held in this matter on August 9, 2005, at which time the Court directed the parties to submit post-trial briefs by August 11, 2005.  The parties asserted the following arguments in support of their respective positions.

A.    **Nickels' Arguments**

First, Nickels argues that Wild Waves is judicially estopped from asserting that the Agreement was terminated pre-petition, and therefore nonexecutory.  Second, Nickels argues that the Agreement is executory, because substantial performance remains due by both parties. Specifically, Nickels argues any performance rendered by Wild Waves was performed in accordance with its obligations under the lease.  Third, Nickels argues that rejection is required in order for Nickels to exercise its best business judgment, because it may obtain a significantly higher sale price from a third party, and because Wild Waves' damage calculations are inaccurate.  Finally, Nickels argues that Wild Waves is not a purchaser "in possession" under § 356(i), and thus, is not entitled to the protections set forth in that section.  Specifically, Nickels argues that Wild Waves occupies only 70 percent of the Pier, and that it has no connection with the remaining, more valuable 30 percent of the Pier.  Nickels also argues that the fact that the water park may be dismantled and moved speaks against permanence and possession.

4

**B.**   <u>**Wild Waves' Arguments**</u>

First, Wild Waves argues that the Agreement is not executory, because (a) the Agreement was terminated pre-petition as a result of Nickels' anticipatory repudiation thereof, and (b) Wild Waves' substantial performance of the Agreement renders its nonexecutory.

Second, Wild Waves argues that Nickels' decision to reject the Agreement was not made in sound business judgment, because (a) Wild Waves' damages are likely to absorb any profit Nickels may realize from a sale to another party; (b) the other offers to purchase the Pier are not a "sure thing," and are subject to several contingencies that potentially may not occur, whereas Wild Waves is prepared to close in the near future; and (c) a sale to Wild Waves would result in a 39.14 percent distribution to creditors, while a sale to a third party would only result in a 37.66 percent distribution to creditors.

Third, Wild Waves argues that Nickels is not entitled to reject the Agreement, because Wild Waves is entitled to specific performance of the Agreement.  As such, Wild Waves holds an equitable remedy that does not give rise to a payment, and as such, is not a claim as defined by § 101(5).

Fourth, Wild Waves argues that if the Court determines that Nickels is entitled to reject the Agreement under § 365(a), Wild Waves is entitled to the benefits set forth in § 365(i), because it is a purchaser "in possession."

**II.**   <u>**DISCUSSION**</u>

**A.**   <u>**The Agreement is Executory**</u>

The term "executory contract" is not defined in the Code.  <u>In re R.M. Cordova Int'l, Inc.</u>, 77 B.R. 441, 445 (Bankr. D.N.J. 1987) (Tuohey, J.).  The Third Circuit has adopted the

following definition expounded by Vern Countryman:

> [An executory contract] is a contract under which the obligation of
> both the bankrupt and the other party to the contract are so far
> unperformed that the failure of either to complete performance
> would constitute a material breach excusing the performance of the
> other.

Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp., 872 F.2d 36 (3d Cir. 1989) (quoting

Countryman, Executory Contracts in Bankruptcy, Part I, 57 Minn. L. Rev. 439, 460 (1973)).

The appropriate time for determining whether a contract is executory is the date of filing.  In re

HQ Global Holdings, Inc., 290 B.R. 507, 510 (Bankr. D. Del. 2003).  In the context of land sale

contracts, a contract is executory where the buyer has not furnished the purchase price and where

seller has not transferred title to the buyer.  McCannon v. Marston, 679 F.2d 13, 18 (3d Cir.

1982).

In the case sub judice, Nickels argues that (a) Wild Waves is barred by the doctrine of

judicial estoppel from asserting that the Agreement is terminated, and (b) the Agreement is

executory, because substantial performance is required by both parties.  Conversely, Wild Waves

argues that the Agreement is not executory, because (a) it was terminated pre-petition as a result

of Nickels' anticipatory repudiation thereof, and (b) Wild Waves substantial performance of the

Agreement renders it nonexecutory.  The Court will address each argument in turn.

## 1.      The Agreement was not Terminated Pre-petition

It is well established that an executory contract or lease that has been validly terminated

pre-petition is "not resurrected by the filing of the petition in bankruptcy, and cannot therefore be

included amount the debtor's assets."  In re Triangle Laboratories, Inc., 663 F.2d 463, 467-68 (3d

Cir. 1981).  Thus, Wild Waves argues that Nickels' anticipatory breach of the Agreement pre-

6

petition rendered it nonexecutory.  For the reasons set forth below, the Court finds that (a) Wild

Waves is barred by the doctrine of judicial estoppel from asserting that Agreement was

terminated pre-petition, and (b) regardless, the Agreement was not terminated pre-petition.

### a.    Judicial Estoppel

The doctrine of judicial estoppel precludes a party "from assuming a position in a legal

proceeding inconsistent with one previously asserted." Oneida Motor Freight, Inc. v. United

Jersey Bank, 848 F.2d 414, 419 (3d Cir. 1988).  A court should impose judicial estoppel only if

> (1) the party to be estopped is asserting a position that is
> irreconcilably inconsistent with one he or she asserted in a prior
> proceeding; (2) the party changed his or her position in bad faith,
> i.e., in a culpable manner threatening to the court's authority or
> integrity; and (3) the use of judicial estoppel is tailored to address
> the affront to the court's authority or integrity.

Montrose Med. Group Participating Sav. Plan v. Bulger, 243 F.3d 773, 777-78 (3d Cir. 2001).

"Absent success in a prior proceeding, a party's later inconsistent position introduces no risk of

inconsistent court determinations, and those poses little threat to judicial integrity." New

Hampshire v. Maine, 532 U.S. 742, 750-51 (2001); accord Montrose Med. Group, 243 F.3d at

778 (holding that "a party has not displayed bad faith for judicial estoppel purposes if the initial

claim was never accepted or adopted by a court or agency").

In this case, Wild Waves successfully argued before the Chancery Division that a valid,

binding agreement of sale was entered into by the parties.  Wild Waves also argues before this

Court that it is entitled to specific performance of the Agreement.  At the same time, however,

Wild Waves argues that the Agreement is nonexecutory because it was terminated pre-petition.

The positions Wild Waves has asserted before the Chancery Division and before this Court are

inconsistent, circuitous, and seemingly designed to achieve an unfair advantage in this litigation.[1]

The Court finds Wild Waves' switch in positions from those asserted in state court to violate the

doctrine of judicial estoppel.  Furthermore, if Wild Waves were not barred by judicial estoppel,

for the reasons set forth below, the Court finds that the Agreement otherwise was not terminated

prior to Nickels' filing.

### b.    Anticipatory Breach/Repudiation

To demonstrate a cause of action for anticipatory breach under New Jersey law,[2] the

moving party must provide evidence of "a definite and unconditional declaration by a party to an

executory contract–through word or conduct–that he will not or cannot render the agreed upon

performance."  Ross Systems v. Linden Dari-Delite, Inc., 35 N.J. 329, 340-41; 173 A.2d 258,

264 (N.J. 1961); see also Universal Computers (Systems), Ltd. v. Universal Computers

(Holdings), Ltd., 653 F. Supp. 518, 525 (D. N.J. 1987) (citing RESTATEMENT (SECOND) OF

CONTRACTS § 250 (1981)).  An anticipatory breach allows a non-breaching movant to treat a

contract as terminated and to refuse to render continued performance thereunder.  Ross Systems,

35 N.J. at 341; 173 A.2d at 265.

---

[1]  Although the court in In re Urban, 202 B.R. 565, 571 (Bankr. S.D.N.Y. 1994) makes no reference to the doctrine of judicial estoppel, its findings are consistent with the doctrine.  In Urban, the court noted that "a debtor is precluded from recognizing the validity of a contract for the purpose of rejecting it and then raising defenses to a claim for damages that are wholly inconsistent with the required finding that a contract existed."  In re Urban, 202 B.R. 565, 571 (Bankr. S.D.N.Y. 1994).  Logically, it follows that a creditor would be precluded from recognizing the existence of a valid binding agreement for the purpose of requesting equitable relief and later asserting that the contract was terminated to avoid the debtor rejecting it as executory because the latter is inconsistent with the required finding that the contract existed in order to obtain equitable relief.

[2]  Causes of action for breach of contract arise under state law.  See Great-West Life & Annuity Ins. Co. v. Knudson, 534 U.S. 204, 220 (2002).

In this case, Nickels has held fast to its position that it never entered into a binding contract of sale with Wild Waves, relying in part on the fact that it never signed a contract of sale. Wild Waves argues that Nickels' statements and actions prior to that determination constituted an anticipatory repudiation, thereby terminating the Agreement. Wild Waves ignores the fact that a cause of action for the breach of a contract necessarily requires the existence and acknowledgment of a binding contract. On April 25, 2005, the Chancery Division entered an order finding that the parties entered into a binding oral agreement of sale. Any statements or actions undertaken by Nickels' up until the Chancery Division rendered its decision cannot be construed as an anticipatory repudiation or breach, because it was Nickel's position that no such contract existed. In other words, Nickels could not anticipatorily breach a contract before there was a determination as to its existence. Essentially, Wild Waves is requesting that the Court retroactively apply the principles of anticipatory breach, when the very nature of a cause of action for anticipatory repudiation requires intent to commit a breach in the future. No such intent is present in this case. Therefore, based on the foregoing, the Court finds that Nickels did not anticipatorily breach the Agreement. Accordingly, the Agreement was not terminated pre-petition.[3]

---

[3] Furthermore, even if Nickels had breached the Agreement pre-petition through anticipatory repudiation, it would not render the Agreement nonexecutory.

Wild Waves relies heavily on In re Murtishi, 55 B.R. 564 (Bankr. N.D. Ill. 1985), in support of its contention that a pre-petition breach by Nickels renders the Agreement nonexecutory. Alternatively, Nickels relies heavily on In re W. & L. Associates, Inc., 71 B.R. 962 (Bankr. E.D. Pa. 1987) in support of its contention that a pre-petition breach would not render the Agreement nonexecutory. This Court finds the reasoning set forth by the W. & L. court to be more persuasive. Specifically, the Court concurs that

We certainly cannot agree with the fact that a debtor has breached

**2.**     <u>The Agreement is Executory Because Substantial Performance
Remains Outstanding on Both Sides</u>

Having found that the Agreement was not terminated pre-petition, the Court now turns to

the issue of whether the Agreement is executory.  As noted above, a contract for the sale of land

is executory if the buyer has not furnished the purchase price and the seller has not transferred

the title.  <u>McCannon v. Marston</u>, 679 F.2d at 18.  In this case, Wild Waves has not delivered the

required deposit, nor furnished the purchase price, and Nickels has not delivered the deed.  As

such, substantial performance remains outstanding on both sides of the contract.  Accordingly,

the Court finds that the Agreement is executory for the purposes of § 365.  Courts have found

land sale contracts executory in cases where significantly more performance was rendered by

one of the parties.  <u>See</u>, <u>e.g.</u> <u>In re Dunes Casino Hotel</u>, 63 B.R. 939, 943, 949 (D.N.J. 1986)

(affirming bankruptcy court finding that the contract was executory where seller delivered deeds

and requested balance of purchase price and buyer refused to remit purchaser price).  Finally, the

Court finds Wild Waves' argument that it substantially performed under the Agreement by

constructing the water park to be unpersuasive because (1) the construction of the water park

was not a condition of that contract; and (2) the purchase price has not been furnished and the

deed has not been delivered.  Therefore, the contract of sale remains executory.

---

a contract pre-petition renders it non-executory.  Most debtors
have breached at least some executory contract pre-petition, and 11
U.S.C. § 365(b) expressly provides them with an opportunity to
cure or provide adequate protection to the obligee and retain their
contractual rights.

<u>W. & L.</u>,  71 B.R. at 966.

### B.    Business Judgment Rule

Pursuant to § 365 of the Code, subject to the bankruptcy court's approval, a trustee may "assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a) (2004).  Section 365(a) does not supply a standard for determining when an executory contract has been properly rejected.  In the Matter of Federated Dep't Stores, Inc., 131 B.R. 808, 811 (S.D. Ohio 1991).  Courts generally apply a business judgment standard when determining whether to authorize the rejection of an executory contract.  Id.[4]  Paramount to this determination is whether the rejection is in the best interests of a debtor's estate.  See In re Food Barn Stores, Inc., 107 F.3d 558, 567, n.16 (8th Cir. 1997).  This is not a "strict standard," but "merely requires a showing that 'rejection would benefit the estate.'"  In re Patterson, 119 B.R. 59, 60 (E.D. Pa. 1990) (quoting In re Bildisco, 682 F.2d 72, 79 (3d Cir. 1982)); see also Sharon Steel Corp. v. Nat'l Fuel Gas Distribution Corp., 872 F.2d 36, 40 (3d Cir. 1989) (noting that "[w]here the rejection of an executory contract would benefit the estate, rejection is appropriate").  In determining  whether rejection is in the best interests of the estate, "[t]he burden or hardship which rejection would impose on other parties to such a contract is not a factor to be weighed by the bankruptcy court in ruling upon the debtor's application."  Federated Dep't Stores, Inc., 131 B.R. at 811.  A bankruptcy court

> should defer to a debtor's decision that rejection of a contract
> would be advantageous unless the decision is so unreasonable that
> it could not be based on sound business judgment, but only on bad
> faith or whim.

In re Balco Equities Ltd., Inc., 2005 Bankr. LEXIS 532, * 34 (Bankr. S.D.N.Y. 2005)

---

[4] The Third Circuit has adopted the business judgment standard.  See In re Fleming Cos. Inc., 308 B.R. 689, 691 (Bankr. D. Del. 2004) (citing In re Taylor, 913 F.2d 102 (3d Cir. 1990)).

(quotations omitted).

In the case at bar, Steven Nickels testified that he has received two offers to purchase the Pier for $15,000,000.00 and $15,400,000.00, respectively.  The Agreement carries a purchase price of $5,500,000.00.  Nickels' decision to reject the Agreement is based in part on these significantly higher offers.  Wild Waves argues that Nickels' decision to reject was not made in sound business judgment, because (a) Wild Waves' damages are likely to absorb any profit Nickels may realize from a sale to another party; (b) the other offers to purchase the Pier are not a "sure thing," and are subject to several contingencies that potentially may not occur, whereas Wild Waves is prepared to close in the near future; and (c) a sale to Wild Waves would result in a 39.14 percent distribution to creditors, while a sale to a third party would only result in a 37.66 percent distribution to creditors.

While Wild Waves concerns may be valid, they are speculative.  No determination has been made on what damages Wild Waves may be entitled to if the Court allows Nickels to reject the Agreement.  Wild Waves' calculation of  a distribution figure without determination of claims is speculation.  The fact that an accountant has estimated distribution figures in this case is unpersuasive because the tax implications have not yet been determined, the status of the insurance recoveries is in dispute and the amount of Wild Waves' rejection claim has not been quantified by resolution or judicial determination.  Wild Waves' speculative distribution calculations are not sufficient to support a finding that the debtor's decision is so unreasonable that it could not be based on sound business judgment.

The Court is disinclined to find that Nickels' decision to reject the Agreement was made in bad faith or upon a whim based on speculations and contingencies.  It is not necessary that the

debtor's proposal is 100 percent guaranteed, but that it is reasonable.  See In Re Balco Equities,

Ltd., 323 B.R. 85, 99 (Bankr. S.D.N.Y 2005) (holding Trustee's rejection of contract and

proposed sale to third party was reasonable because third party offer was substantially higher and

would benefit the estate); In Re Prime Motor Inns, 124 B.R. 378, 379 (Bankr. D. FLA. 1991)

(evidence that a new contract may not generate more profits and might actually cause a decline

in value was not enough to counteract the broad application of business judgment standard); *Cf.*

In Re Huff, 81 B.R. 531, 538 (Bankr. D. Minn. 1988) (debtors failed business judgment because

could not demonstrate any other more profitable offer and the prospect of an alternate lease was

speculative).   The fact that the debtor has multiple offers to buy the property coupled with the

increase in Wildwood real estate values is sufficient to find that Nickels exercised reasonable

business judgment in rejecting the Agreement.   Therefore, Nickels' decision to reject the

Agreement satisfies the modest requirements of the business judgment standard.

C.    **Rejection Pursuant to § 365(a)**

Pursuant to § 365(a), subject to the bankruptcy court's approval, a trustee or debtor-in-

possession "may assume or reject an executory contract or unexpired lease . . . ." 11 U.S.C. §

365(a) (2005).  Wild Waves argues that Nickels' cannot reject the Agreement because it is

entitled to specific performance under state law.  In support of this contention, Wild Waves

argues that its specific performance claim, as an equitable remedy, is not a claim under § 101(5)

of the Code.  Alternatively, Wild Waves argues that it is entitled to the protections provided in §

365(i) because it is a purchaser "in possession."  In response, Nickels argues that federal

bankruptcy law should preempt Wild Waves' state law remedies, and that Wild Waves is not "in

possession," because it occupies only 70 percent of the Pier.

13

1.      **Specific Performance and Federal Preemption**

a.      **Specific Performance**

Under New Jersey law, specific performance is an equitable remedy that is appropriate

when legal damages are insufficient, or when a court cannot reasonably ascertain the amount of

damages.  In re Envtl. Ins. Declaratory Judgment Actions, 149 N.J. 278, 295-96; 693 A.2d 844,

851-52 (N.J. 1997).  "There is a virtual presumption, because of the uniqueness of land and the

consequent inadequacy of monetary damages, that specific performance is the buyer's

appropriate remedy for the vendor's breach of the contract to convey."  Friendship Manor, Inc.,

244 N.J. Super. 104, 113; 581 A.2d 893, 897 (N.J. Super. App. Div. 1990).  "Nevertheless, it is

also clear that specific performance is a discretionary remedy resting on equitable principles and

requiring the court to appraise the respective conduct and situation of the parties."  Id. at 244

N.J. Super. at 113; 581 A.2d at 898.

Wild Waves asserts that it is entitled to specific performance of the Agreement and a

remedy for Nickels' alleged and as of yet undetermined breach of the Agreement.  Wild Waves

argues that "if a court determines that Wild Waves is entitled to specific performance, there will

have necessarily been a determination that there is no adequate monetary remedy."  Wild Waves'

Brief at 9.[5]  For the reasons set forth below, the Court finds that the Bankruptcy Code preempts

Wild Waves' claim for specific performance.

---

[5] Wild Waves relies heavily on Judge Scholl's decision in In re Walnut Associates, 145
B.R. 489, 494 (Bankr. E.D. Pa. 1992).  In Walnut Associates, Judge Scholl postulated that "if
state law does authorize specific performance under the rejected executory contract, it means that
the non-debtor should be able to enforce the contract against the Debtor, irrespective of his
rejection of it."  Judge Scholl cites no authority for this assertion and does not discuss the
remedies set forth in § 365(i)(1).

### b.    <u>Federal Preemption</u>

Under the doctrine of preemption, "state laws that interfere with or are contrary to federal law are preempted and without effect pursuant to the Supremacy Clause of the United States Constitution." <u>In re Loranger Mfg. Corp.</u>, 324 B.R. 575, 582 (Bankr. W.D. Pa. 2005).  Although preemption is governed by the Supremacy Clause, "it is fundamentally a question of Congressional intent in which the presumption is that Congress did not intend to displace state law." <u>In re Miles</u>, 294 B.R. 756, 759 (B.A.P. 9th Cir. 2003).  "[E]stablishing that federal law overlaps state law is, by itself, insufficient to establish that federal law preempts state law." <u>Green v. Fund Asset Management, L.P.</u>, 245 F.3d 214, 228 (3d Cir. 2001).

Federal law preempts state law in three situations: "(1) express preemption, (2) field preemption (which is also sometimes referred to as implied preemption), or (3) conflict preemption." <u>Id.</u> at 222.  Express preemption is appropriate "when there is an explicit statutory command that state law be displaced." <u>Id.</u>  Field preemption is appropriate when federal law "so thoroughly occupies a legislative field as to make reasonable the inference that Congress [left] no room for the States to supplement it." <u>In re Forman Enters., Inc.</u>, 281 B.R. 600, 607 (Bankr. W.D. Pa. 2002).  Congressional intent

> may be inferred from a scheme of federal regulation that is so comprehensive, or where the federal interest so dominates, that the federal system may be assumed to preclude enforcement of state laws on the same subject.  When a federal scheme is sufficiently comprehensive to warrant an inference that Congress 'left no room' for state regulation, the 'field' has been preempted.

<u>Miles</u>, 294 B.R. at 759.  Finally, conflict preemption is appropriate if a state law conflicts with a federal law such that "(1) it is impossible to comply with both state law and federal law; or (2) the state law 'stands as an obstacle to the accomplishment and execution of the full purposes and

15

objectives of Congress." Forman Enters., 281 B.R. at 607 (quoting Orson, Inc. v. Miramax Film

Corp., 189 F.3d 377, 382 (3d Cir. 1999)).

Section § 365(d)(2) provides that a trustee or debtor-in-possession

> may assume or reject an executory contract or unexpired lease of
> residential real property or of personal property of the debtor at
> any time before the confirmation of a plan but the court, on the
> request of any party to such contract or lease, may order the trustee
> to determine within a specified period of time whether to assume
> or reject such contract or lease.

11 U.S.C. § 365(d)(2) (2005).  If a trustee or debtor-in-possession rejects an executory contract

for the sale of real property "under which the purchaser is in possession, such purchaser may

treat such contract as terminated, or, in the alternative, may remain in possession of such real

property or timeshare interest."  11 U.S.C. § 365(i)(1) (2005).  A purchaser must be in

possession of the property on the date of bankruptcy.  In re Young, 214 B.R. 905, 911 (Bankr. D.

Idaho 1997).   If the purchaser remains in possession, it must

> continue to make all payments due under such contract, but may,
> offset against such payments any damages occurring after the date
> of the rejection of such contract caused by the nonperformance of
> any obligation of the debtor after such date, but such purchaser
> does not have any rights against the estate on account of any
> damages arising after such date from such rejection, other than
> such offset.

Id. at § 365(i)(2)(A).  When the purchaser completes the contract payments, the trustee or

debtor-in-possession must "deliver title to the purchaser in accordance with the provisions of

such contract, but is relieved of all other obligations to perform under such contract."  Id. at §

365(i)(2)(B); In re Pogue, 130 B.R. 297 (Bankr. E.D. Mo. 1990).

Neither the Code, nor the legislative history attendant to § 365(a) explicitly command

16

that the Code section preempts a party's state law remedies. Thus, express preemption is

inappropriate in this case. However, a question remains as to whether implied or conflict

preemption are appropriate. For the reasons set forth below, the Court finds that § 365(i)

preempts Wild Waves' claim for specific performance.

First, preemption can be reasonably inferred by the comprehensive nature of the Code.

More specifically, as the Ninth Circuit Court of Appeals noted in <u>MRS Exploration, Ltd. v.</u>

<u>Meridian Oil, Inc.</u>, 74 F.3d 910 (9th Cir. 1996), the

> complex, detailed, and comprehensive provisions of the lengthy
> Bankruptcy Code . . . demonstrates Congress's intent to create a
> whole system under federal control which is designed to bring
> together and adjust all of the rights and duties of creditors and
> embarrassed debtors alike.

<u>MRS Exploration, Ltd. v. Meridian Oil, Inc.</u>, 74 F.3d 910, 915 (9th Cir. 1996). The court

further noted that

> [w]hile it is true that bankruptcy law makes reference to state law
> at many points, the adjustment of rights and duties within the
> bankruptcy process itself is uniquely and exclusively federal. It is
> very unlikely that Congress intended to permit the superimposition
> of state remedies on the many activities that might be undertaken
> in the management of the bankruptcy process.

<u>Id.</u>

Second, the purpose of § 365(i)(2)(B) is to preserve a "purchaser's right to specific

performance on an executory contract for sale of real estate." <u>In re Delaney</u>, 2003 Bankr. LEXIS

1765, * 16 (Bankr. D. Mass. 2003). In other words, the protections set forth in § 365(i)(2)(B) are

in place to compensate a purchaser for its lost right to specific performance by way of § 365(a).

It is reasonable to infer that Congress did not intend to allow debtors to reject real estate sale

contracts under § 365(a) only to have the purchasers turn around and enforce the Agreement it

just rejected.  Further, the comprehensive framework Congress set forth in § 365(i) to address

rejected real estate sale contracts speaks to preemption.  See In re Hechinger Investment Co. of

Del., 274 B.R. 71, 97 (Bankr. D. Del. 2002) (finding that § 546(e) preempted state remedies

because "the Code comprehensively addresses such claims").

Third, disallowing Nickels' opportunity to reject the Agreement because Wild Waves has

a claim for specific performance would be tantamount to allowing Wild Waves to circumvent

Nickels' right to reject under § 365(a), and would obviate the need for and frustrate the purpose

of § 365(i).  As noted by the Fourth Circuit Court of Appeals in Lubrizol Enters., Inc. v.

Richmond Metal Finishers, Inc., 756 F.2d 1043, 1048 (4th Cir. 1985), "allowing specific

performance would obviously undercut the core purpose of rejection under § 365(a), and that

consequence cannot therefore be read into congressional intent."  Lubrizol Enters., Inc. v.

Richmond Metal Finishers, Inc., 756 F.2d 1043, 1048 (4th Cir. 1985).[6]

Finally, other courts have held that specific Code provisions preempted a party's state

law claims or remedies.  See, e.g. In re Loranger Mfg. Corp., 324 B.R. 575, 583 (Bankr. W.D.

Pa. 2005) (finding that plaintiff's claim for unjust enrichment was preempted by § 546(e)); In re

Abramson, 313 B.R. 195, 197 (Bankr. W.D. Pa. 2004) (finding that the Code preempts state law

claims that are based upon allegations that a Code provision has been violated); Pacific Gas and

Electric Co. v. People of the State of Cal., 350 F.3d 932, 937 (9th Cir. 2003) (finding that a

chapter 11 plan of reorganization "expressly preempts otherwise applicable nonbankruptcy

laws"); Miles, 294 B.R. at 761 (finding that complaints arising out of actions undertaken in

---

[6]  See In re Ducane Gas Grills, Inc., 320 B.R. 341, 350, n.12 (Bankr. D.S.C. 2004)
(noting that even though Congress overruled the Lubrizol court's holding with regard to §
365(n), otherwise its analysis of § 365 is sound).

connection with preparing a petition are preempted by the Code; <u>Hechinger Investment</u>, 274

B.R. at 96-97 (finding that § 546(e) preempts unjust enrichment claim); <u>Eastern Equipment and</u>

<u>Services Corp. v. Factory Point Nat'l Bank</u>, 236 F.3d 117, 121 (2d Cir. 2001) (finding that the

Code preempted state law tort claims arising from § 362 stay violations); <u>In re Reyes</u>, 238 B.R.

507, 522 (Bankr. D.R.I. 1999) (finding that § 524 preempts state law remedies); <u>Summit</u>

<u>Investment and Development Corp. v. Leroux</u>, 69 F.3d 608, 609 (1st Cir. 1995) (affirming

bankruptcy court decision that § 365(e) preempted certain provisions of the parties partnership

agreement).

Therefore, based on the foregoing, the Court finds that § 365(i) preempts Wild Waves'

state law remedy of specific performance.

### c.     Wild Waves' Claim Argument

Wild Waves also argues its cause of action for specific performance is not a "claim"

within the meaning of § 101(5), and thus, cannot be discharged by Nickels.  Conversely, Nickels

argues that (1) specific performance is not the exclusive remedy for the breach of a real estate

sale contract and (2) regardless, a claim for specific performance is a claim within the meaning

of § 101(5).

In relevant part, § 101(5) defines a "claim" as a

> right to an equitable remedy for breach of performance if such
> breach gives rise to a right to payment, whether or not such right to
> an equitable remedy is reduced to judgment, fixed, contingent,
> matured, unmatured, disputed, undisputed, secured, or unsecured.

11 U.S.C. § 101(5)(B) (2005).

An equitable remedy can be a claim in bankruptcy under § 101(5) provided that it can be

reduced to monetary damages.  Claims are to be interpreted broadly in order to allow debtors to

19

meet legal obligations and also to allow claim holders to participate in the bankruptcy

proceeding.  Air Line Pilots Assn v. Continental Airlines, 125 F.3d 120, 132 (3d Cir. 1997).  An

equitable right that "gives rise to a right of payment can be a claim."  Id.  An equitable right that

can be reduced to monetary damages is a claim.   In re Kilpatrick, 160 B.R. 560, 564 (Bankr. D.

Mich. 1993).   See Ohio v. Kovacs, 469 U.S. 274, 283 (1985) (injunction transformed into an

obligation to pay money was a "claim").

The language of § 101(5)(B) states that a remedy for breach of performance can be a

claim if that breach gives rise to a right of payment.  Wild Waves can have a claim under the

plain meaning of § 101(5)(B).  In general, there are alternate remedies for breach of contract.

The traditional remedy at law for breach of contract, expectation damages, is always available.

In the alternative, in some cases, the non-breaching party may be entitled to equitable relief such

as specific performance.  Specific performance is available in instances where the remedy at law

fails to do justice to the parties.  Fleischer v. James Drug Stores, Inc., 1 N.J. 138, 146 (N.J.

1948)(citing  Pomeroy's Equity Jurisprudence (5th ed. 1941) § 1401)).  As set forth above, §

365(i) and (j) protect Wild Waves' right to specific performance of a contract and preempts state

law to that extent.

Therefore, the Court rejects Wild Waves' argument that its rights for breach of contract is

not a "claim" within the meaning of § 101(5)(B) and cannot be discharged in a bankruptcy

proceeding.

### D.    Purchaser "In Possession"

Having determined that the Agreement is executory and may be rejected by Nickels

pursuant to § 365(a), the Court must determine whether Wild Waves is entitled to the protections

set forth in § 365(i).  To make such a determination, the Court must first examine whether Wild

Waves is "in possession" of the Pier pursuant to § 365(i).  The Chancery Division determined

that Wild Waves held a lease for 70 percent of the Pier, but that it was contracted to purchase the

entire Pier under an oral agreement of sale.  It cannot be disputed that Wild Waves is "in

possession" of 70 percent of the Pier, but an issue has arisen as to whether Wild Waves is

considered "in possession" under § 365(i) when the debtor still maintains some control over 30

percent of the pier .[7]

The term "possession" is not defined in the Code.  There is a paucity of cases on the issue

of what constitutes "possession" within the context of § 365(i), and there are no cases where a

purchaser was in partial possession of the property to be purchased.  Nickels relies exclusively

on In re Summit Land Co., 13 B.R. 310 (Bankr. D. Utah 1981) in support of its contention that

Wild Waves would not be entitled to relief  in § 365(i) because it is not in possession of the

entire Pier.  Wild Waves cites no applicable case law, but argues that Summit Land is factually

---

[7] If Wild Waves were not in possession of the property, § 365(j) would apply.  Section
365(j) provides that

> [a] purchaser that treats an executory contract as terminated under
> subsection (I) of this section, or a party whose executory contract
> to purchase real property from the debtor is rejected and under
> which such party is not in possession, has a lien on the interest of
> the debtor in such property for the recovery of any portion of the
> purchase price that such purchaser or party has paid.

11 U.S.C. § 365(j) (2005).  Thus, if Wild Waves were not in possession, it would only be entitled
to a lien in the amount of any amount it had paid toward the purchase price.  In re Young, 214
B.R. 905, 911 (Bankr. D. Idaho 1997) (holding that purchasers not in possession "are limited to a
lien on the property for that part of the purchase price paid, and a claim in the bankruptcy case
for any rejection damages").

distinguishable to the case at bar.  The Court heard extensive testimony on the issue of

possession.  For the reasons set forth below, the Court finds that Wild Waves is in possession of

the Pier within the meaning of § 365(i), and thus, may elect to remain in possession of the Pier.

In <u>Summit</u>, the property at issue was "a recreational park with use confined to activities

such as hunting, fishing, hiking, and camping." <u>Summit Land</u>, 13 B.R. at 311.  The agreement at

issue provided that "[n]o structure other than a tent for camping may be erected by members,"

and that [o]utings to the property are thus intermittent, on vacations and weekends." <u>Id.</u> at 311-

12.  The <u>Summit</u> court found that the buyer was not in possession the property, because (1) its

use was intermittent, as the property was used for vacations; (2) it could not make permanent

improvements on the property; (3) its use of the property was shared; (4) it held a non-exclusive

easement in gross; (5) the property was designed against partitioning; (6) its use of the property

was delegable, in that it could designate others to be members; and (7) its interests were

susceptible to speculation, because they were divisible and transferable without restriction. <u>Id.</u>

In so holding, the court reasoned that the term "possession" in § 365(i) "suggests a concern for

buyers whose connection with the land is more permanent than ephemeral, more continuous than

intermittent, more exclusive than shared, and more personal than delegable." <u>Id.</u> at 318.

For the following reasons, the facts of <u>Summit Land</u> are distinguishable from the case at

bar.  First, although the water park is seasonal in nature, Wild Waves remained in possession of

the property all year.  Second, Wild Waves was entitled to encumber the Pier with a mortgage,

which it did.  Third, Wild Waves was permitted to build a water park on the Pier.  Fourth,

although some of the components of the water park are removable, Wild Waves invested

substantial sums building a new concrete foundation and otherwise preparing the Pier to hold the

water park with these structural components which remain immovable.  Fifth, Wild Waves has

been operating the water park on the Pier since 2000.  Sixth, Wild Waves had access to the

remaining 30 percent of the Pier.  Specifically, Wild Waves held an office above and utilized

storage space below the arcade building.  Finally, there is nothing in the Code, caselaw, or

legislative history that suggests that exclusive possession is required under § 365(i).

The Court finds that for the purposes of § 365(i), Wild Waves was "in possession" at the

time Nickels filed its bankruptcy petition.  Therefore, Wild Waves is entitled to the protections

outlined in § 365(i).

III.   **CONCLUSION**

Based on the foregoing, the Court finds that the Agreement is executory, and that Nickels

may reject the Agreement pursuant to § 365(a), but that Wild Waves is entitled to the protections

set forth in § 365(i).

BY THE COURT:

GLORIA M. BURNS
United States Bankruptcy Judge

23