NOT FOR PUBLICATION

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY

**FILED**

JAMES J. WALDRON, CLERK

[May 21, 2010]

U.S. BANKRUPTCY COURT
CAMDEN, N.J.
BY: s/ Margie McGettigan, Deputy

IN RE:                                          :

                                                :

NICKELS MIDWAY PIER, LLC,        :        CHAPTER 11

                                                :

                        Debtor.            :        CASE NO. 03-49462 (GMB)

                                                :

                                                :        MEMORANDUM OPINION

                                                :

APPEARANCES:

                        Frederic R. Cohen, Esquire
                        Alan C. Milstein, Esquire
                        Sherman, Silverstein, Kohl, Rose & Podolsky, P.A.
                        4300 Haddonfield Road, Suite 311
                        Pennsauken, NJ 08109
                        Attorneys for Debtor

                        Michael A. Zindler, Esquire
                        Teich Groh
                        691 State Highway 33
                        Trenton, NJ 08619
                        Attorney for Debtor

                        Arthur J. Abramowitz, Esquire
                        Jerrold N. Poslusny, Esquire
                        Cozen O'Connor
                        457 Haddonfield Road, Suite 300
                        Cherry Hill, NJ 08002
                        Attorneys for Wild Waves, LLC

                        Willis F. Flower, Esquire
                        Ford, Flower & Hasbrouck
                        Central Square, Box 405
                        Linwood, NJ 08221
                        Attorney for Wild Waves, LLC

                        Jerrold S. Kulback, Esquire
                        Archer & Greiner
                        One Centennial Square
                        Haddonfield, NJ 08033
                        Attorney for John, Steven, and Angelo Nickels

Joseph A. McCormick, Jr., Esquire
Weinberg & McCormick
109 Haddon Avenue
Haddonfield, NJ 08033
Attorney for Quickwater, LLC, Nancy Nickels, Sandra Kirk,
Chris and John Bilios, Castle Enterprises, N.F.R., LLC,
Midway Games Corp., LLC

Steven I. Kaplan, Esquire
505 New Road
P.O. Box 296
Northfield, NJ 08925
Attorney for Maryann Gormley

Jeffrey M. Sponder, Esquire
United States Department of Justice
Office of the United States Trustee
One Newark Center, Suite 2100
Newark, NJ 07102
Attorney for Roberta DeAngelis, Acting United States
Trustee, Region 3

Before the Court is Wild Waves, LLC's First Amended Plan for Liquidation of Nickels

Midway Pier, LLC for confirmation.

## I.    JURISDICTION

The Court has jurisdiction pursuant to 28 U.S.C. §§ 1334(a) and 157(a), and the Standing

Order of the United States District Court for the District of New Jersey dated July 23, 1984,

referring all bankruptcy cases filed in the district to the bankruptcy courts.  This is a core

proceeding pursuant to 28 U.S.C. § 157(b)(2)(L).  The District of New Jersey is a proper venue

pursuant to 28 U.S.C. §§ 1408 and 1409.  The following shall constitute findings of fact and

conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.

## II.    PROCEDURAL HISTORY AND FACTS

Wild Waves, LLC ("Wild Waves") filed its Liquidating Chapter 11 Plan and Disclosure

Statement on November 24, 2009.  After objections were presented, a Modified Disclosure

Statement was filed on January 7, 2010, which was approved by Order dated January 12, 2010 and a Confirmation hearing was scheduled for February 24, 2010. The following parties filed objections to the Modified Plan of Wild Waves: the Debtor-In-Possession, a group of six tenants of the pier subject to leases that run through the 2010 summer season ("tenants"), the three individual members of the Debtor-In-Possession, Angelo Nickels, John Nickels, and Steven Nickels ("members"), secured creditor Maryann Gormley, and the United States Trustee.

The members asserted that the Plan was not filed in good faith, that it improperly gerrymandered the classes in violation of 11 U.S.C. §1129(b)(1), that it provided for improper third party releases, that it violates New Jersey law by providing for an improper credit, that the credit, even if appropriate, is improperly calculated, that the Plan lacks a true effective date, violates 11 U.S.C. §1129(a)(9), and 11 U.S.C. §1129(a)(4), and that the Plan is not fair or equitable. The Debtor-in-Possession joined in the objections asserted by the members and added the following additional objections: that the Plan did not accurately provide for administrative expenses, was not filed in good faith, did not provide proper credits to the pier purchase price, the Plan did not explain how it would pay the claims of the Debtor-In-Possession if it exceeds the Wild Waves claim, has not demonstrated that it is a party in interest entitled to file a plan, that Wild Waves cannot establish rejection damages if the Debtor-In-Possession rejects the agreement of sale, and that the confirmation process should allow the Debtor-In-Possession to file a competing plan.

Maryann Gormley objected to the treatment of the Gormley mortgage, the tenants objected to the Plan's proposed rejection of the leases, and the United States Trustee objected to the broad exculpation and release provisions, questioned feasibility of the Plan and asserted that all past due quarterly fees must be paid before the Plan could be confirmed.

The confirmation hearing commenced on February 24, 2010 and continued to completion on March 18, 2010.  The Court took the matter under advisement and allowed Wild Waves to file a written amendment to the Plan in accordance with the oral amendment set forth on the record at the hearing. The parties were each permitted to file post-hearing briefs by March 29, 2010.  The Debtor-In-Possession, the members, the tenants, and Wild Waves filed post-hearing briefs on or before March 29, 2010.  On March 31, 2010, Wild Waves filed a supplemental letter brief to address a legal issue not asserted at the hearing and not previously addressed, concerning assumption of the lease by the proponent.  Counsel for the members responded to the supplement with a letter memo filed on April 7, 2010.  The court has taken all of the submissions under consideration in reaching its decision in this matter and will address the respective issues in dispute.

This case, filed in December 2003, has a long, contentious, and litigious history, in both the Bankruptcy Court and the state court.  The Debtor-In-Possession owns an amusement pier located at 3500 Boardwalk in Wildwood, New Jersey ("Pier), and another property located at 3214-16 Boardwalk in Wildwood New Jersey ("small property").  In 1999, the Debtor-In-Possession and Wild Waves entered into a lease agreement which permitted Wild Waves to lease a substantial portion of the pier for the purpose of constructing and operating a water park, which was constructed and operated by Wild Waves since 2000.  Wild Waves contended that the lease agreement was entered in connection with an oral agreement of sale whereby the Debtor-In-Possession promised to sell the pier to Wild Waves for $5.5 million on January 31, 2003.  Over the objection of the Debtor-In-Possession, by order dated April 12, 2005, Judge George L. Seltzer, of the Superior Court of New Jersey, Chancery Division determined that an agreement to

sell was reached in May 1999 in accordance with a written contract even though the written contract was never executed by the Debtor-In-Possession.

While the parties were involved in the state court litigation two fires occurred on the property. The first fire occurred on January 16, 2002 and destroyed the Castle and Dungeon amusements which were located within the leasehold premises occupied by Wild Waves. The second fire occurred on July 16, 2002 and caused additional damage to the pier and the water park. The Debtor-In-Possession and its insurance carrier brought suit in the United States District Court of New Jersey regarding liability for the fire. The suit resulted in a judgment against Wild Waves in the amount of $389,182.50 and a determination that Wild Waves was 30% at fault regarding the first fire and had no liability regarding the second fire.

During the six year history of this case, the parties have litigated and appealed numerous issues, however, no party has successfully confirmed a plan of reorganization. The Debtor-In-Possession had filed a plan and disclosure statement early in the case on July 20, 2005, but despite several scheduled hearings on the adequacy of the disclosure statement, the Debtor-In-Possession did not move forward with its initial plan. On November 9, 2009, the Court directed the Debtor-In-Possession to file an amended plan and disclosure statement, and the Debtor-In-Possession complied by filing the documents on January 8, 2010. Despite several hearings to approve adequacy of the disclosure statement and move forward with confirmation, the Debtor-In-Possession was unable to proceed to confirmation because the plan required either the determination or estimation of claims prior to proceeding, and hearings regarding same have been scheduled but not yet held.

In the meantime, Wild Waves, LLC, creditor of the Debtor-In-Possession, filed a liquidating plan of reorganization on November 24, 2009. Adequacy of the disclosure statement

was approved on January 12, 2010, and a hearing on confirmation was held on February 24,

2010 and March 18, 2010.  The Plan proposes to liquidate the Debtor-In-Possession's assets by

proceeding with the sale of the Pier to Wild Waves, LLC pursuant to the agreement of sale

between Wild Waves and the Debtor-In-Possession ("Sale Agreement"), selling the other real

property of the Debtor-In-Possession located at 3214-16 Boardwalk, Wildwood, New Jersey,

liquidation of other assets of the Debtor-In-Possession, and pursuing causes of action against the

members and other insiders, at the discretion of the Plan Administrator, Andrew Weiner, the

managing member of Wild Waves.  The Plan proposes to liquidate these assets and distribute

them to creditors as follows:

> Administrative claims - Trade claims and U.S. Trustee fees to be paid within 10 days of the effective date, NCM mortgage to be paid in full at closing on the pier, and Professional fees to be paid within 10 days of the later of the effective date or court approval.

> Secured Claims - Sun Bank mortgage will retain its lien and be paid according to its terms by Wild Waves but not from the debtor's assets, and the Gormley mortgage will be paid regular installments and then in full upon sale of the small property.

> Unsecured creditors - All unsecured creditors except Wild Waves are to be paid in full with interest at the Federal Judgment rate in effect on the petition date (1.37%). Wild Waves claim would be paid to the extent possible from recovery of funds from the debtor's assets after all other creditors as set forth above and after repayment of the Plan Administrator loan and to the extent funds are available, interest at the Federal Judgment rate as of the petition date.

> Equity interest holders - Will retain their interest and be paid to the extent funds remain after the payment of administrative claims, all classes of claims and repayment of the Plan Administrator loan.

The parties stipulated to the following:

1.  The debtor received insurance proceeds for loss of
    the building from the first fire in the amount of
    $2,518,343.96.

2.  The debtor received insurance proceeds for lost
    contents from the first fire in the amount of
    $962,021.

3.  The debtor received insurance proceeds for building
    loss from the second fire in the amount of
    $442,555.18.

4.  The debtor received contents loss from the second
    fire in the amount of $50,000.

5.  The debtor received $250,000 as proceeds from the
    AMC settlement and $138,000 as a share of
    proceeds from the Mullen settlement.

Wild Waves presented three witnesses in support of its Plan: (1) Andrew Weiner, managing

member of Wild Waves; (2) Brian Baratz, CPA; and (3) appraiser J. Paul Bainbridge.

Mr. Weiner testified that he learned that the Debtor-In-Possession was negotiating a deal

to sell its pier to another party in early 1999 for $5.5 million and advised Steven Nickels that he

was interested in purchasing it under similar terms. An agreement was made in which Wild

Waves would lease the pier, collect income from the operation of the castle and dungeon and

purchase the pier in January 2003. After years of litigation in state and bankruptcy courts, Wild

Waves has proposed the Plan before the Court today which Mr. Weiner believes to have been

filed in good faith. The Plan proposes to effectuate the agreement that was entered into in March

1999 between Wild Waves and the Debtor-In-Possession and provide for payments to secured

and unsecured creditors. Although the purchase price under the agreement is $5.5 million, the

Plan provides for credits to the purchase price of $4,360,000, and the payment of $1,140,000 by

Wild Waves at closing.  The funds for closing would be available from the following sources: $425,000 in escrow pursuant to the amendment to the lease, $15,000 in escrow with Mr. Flowers, $800,000 in Wild Waves bank account and access to a line of credit with Crest Savings Bank in the amount of $800,000.

Mr. Weiner summarized the Plan as proposing to pay the NCM mortgage at closing, as well as an unpaid tax claim and attorney fees of approximately $50,000 to $60,000.  The balance of funds would be paid to the plan administrator (Mr. Weiner) who would pay all approved administration costs including professional fees, and unsecured creditors 100% plus interest, except for the Wild Waves claim which would be subordinated to other unsecured claims. Wild Waves would loan to the reorganized debtor the amount necessary to fund the Plan which Mr. Weiner anticipated would approximate $2 million.  The loan would be repaid if sufficient funds were collected by the plan administrator and if not, it would not be repaid and would be a contribution to the reorganized debtor.

The Plan also includes releases by the Debtor-In-Possession and its members of Wild Waves and its members except as to the fire and claims litigation. Mr. Weiner testified that the releases are an essential component of the Plan, and that the releases are necessary to end all the litigation, as Wild Waves is contributing a lot of money and taking a lot of risk.  He also asserted that he should be plan administrator because he could do the job more efficiently and quicker than anyone else and with less cost.

The Debtor-In-Possession has entered into agreements to lease buildings and kiosks to various tenants. The Plan calls for termination of all leases on the pier, because Wild Waves wants to renegotiate the terms of the leases which do not require deposits and do not require payments until mid-June. According to Mr. Weiner, all of the tenants are aware of the litigation

between the Debtor-In-Possession and Wild Waves, and the Sale Agreement provides that the Debtor-In-Possession shall not renegotiate, renew, or enter into new leases without the consent of the buyer, Wild Waves.

Mr. Weiner further testified that he would handle all matters as plan administrator other than the claims litigation and fire litigation and that the Nickels brothers should handle those matters as it is in their interest to do so, and to the extent any funds remain after payment of all other claims, repayment of the loan from Wild Waves and its subordinated claim, as well as payment to Mr. Weiner as plan administrator at an hourly rate of $250, the balance of funds would be paid to the members.

Mr. Weiner asserted that the Plan complies with the Bankruptcy Code and other applicable laws, that there would be no change in the Debtor-In-Possession's ownership structure, that there is no government commission which controls rates in this case, that Wild Waves is the only impaired class of creditors and it has voted to accept the Plan, that he made a business judgment to separately classify the Wild Waves claim from other unsecured creditors, and that the Plan as proposed is feasible.

On cross-examination, Mr. Weiner conceded that the Sale Agreement allocated $2 million to the value of the buildings and structures, and $2 million to the real estate, and that under the agreement, if all of the structures were destroyed by fire, the buyer would have the right to purchase the property for $2 million. In addition, although the castle and dungeon, the largest structure on the property, was destroyed by fire, other structures including the arcade, remained.

Wild Waves determined that assumption of the Sale Agreement was in the best interests of the estate and that rejection would lead to rejection damages and all claims would not be

satisfied. Wild Waves did not independently value the pier but accepted the Debtor-In-Possession's $7 million value as of the filing date and did not consider the tax consequences to the members.

Mr. Baratz, a Certified Public Accountant and member of the National Association of Certified Valuation Analysts and American Association of Insolvency Accountants testified as an expert regarding a liquidation analysis which he prepared and which was admitted as Exhibit WW14. The liquidation analysis shows that despite a chapter 7 liquidation resulting in a greater amount of funds available for unsecured creditors after liquidation of creditors, the Wild Waves' Plan yields a greater recovery for unsecured creditors other than Wild Waves (100% plus interest) because Wild Waves consents to its claim being subordinated to other unsecured creditors. The Liquidation analysis shows a distribution of 7.25% based on the allowance of a claim for Wild Waves of $5,860,920. This claim is disputed by the Debtor-In-Possession and the allowance of same has not as of yet been determined.

J. Paul Bainbridge, an MAI designated appraiser testified regarding the valuation of the amusement pier and the small property and presented appraisals which were admitted as Exhibits WW-15 and WW-17.[1]

Mr. Bainbridge determined the market value of the pier to be $5,000,000 and the small property to be valued at $625,000. He utilized both the income approach and comparable sales approach to arrive at his valuations. He also determined a forced sale value for the pier at $3,750,000 and for the small property at $470,000.

---

[1] During the hearing, the Debtor-In-Possession objected to the use of Mr. Bainbridge's appraisals because they included a designation as restricted appraisals. The Court took this objection under consideration during the break between day one of the hearing and day two and ruled that the appraisals were admissible. The Court also ruled after the break that the doctrine of recoupment was inapplicable to the matter before the Court.

After Wild Waves presented its case in support of the proposed Plan, the Debtor-In-Possession presented the testimony of Steven Nickels in opposition to confirmation.  Mr. Nickels testified that the pier had been owned and operated by the Nickels family since 1976 and provided a living for their families.  He testified regarding the insurance proceeds received by the Debtor-In-Possession as a result of the fires and the expenses he asserted were incurred and paid from the proceeds.  He submitted documents N-2 and N2A which are summaries of the losses and expenses.  Attached to N-2 are computer printout sheets setting forth various numbers which Mr. Nickels testified represented expenses paid for repairs to the pier although no invoices, bills or other documentation is attached to support the figures on the sheets.  The transaction sheets are dated February 19, 2010 indicating that they were prepared for this proceeding and not at the time the bills were incurred.  Also attached to the summary are insurance policy declaration pages from 1998, 1999, 2000, 2001 and 2002.  The last pages are made up of several employee payroll records.  Mr. Nickels also asserts that if Wild Waves is entitled to a credit for any insurance proceeds, which the Debtor-In-Possession disputes, the amount should be reduced by the amount of pre-fire rent with interest and the Debtor-In-Possession's recovery of funds attributable to molds owned by the Debtor-In-Possession which the Debtor-In-Possession asserts were not subject to sale to Wild Waves.  None of the attachments to the summary or other documents presented appear to allocate certain amounts of the insurance proceeds to the molds which he asserts are not part of the sale to Wild Waves.  The molds were utilized to make spare parts for the castle and dungeon amusement and were housed in the structure.  Other than the summary and sheets provided by Mr. Nickels and prepared by his staff, no other documents were presented to support the testimony that the insurance proceeds were utilized to replace the building or content losses.

11

Mr. Nickels also asserts that he and his brothers will have significant tax liability upon the sale of the pier under the Plan, suggesting that his obligation would be $1,700,000 to $2,000,000 if the pier were sold for $5,500,000. No other support for this assertion was presented. Mr. Nickels also testified that he had a mortgage commitment in his office to provide financing to refinance the pier although no such evidence was presented to the Court.

Wild Waves recalled Mr. Baratz to testify on rebuttal regarding the tax liability which would be attributable to the members upon sale of the pier under the Plan. He testified that the sale would result in a loss to the Debtor-In-Possession therefore, leading to no taxable gain to the members.[2]

## III.    DISCUSSION

11 U.S.C. § 1129 sets forth the requirements that a proponent must meet in order to confirm a Chapter 11 plan. "[T]he proponent bears the burden of establishing the plan's compliance with each of the thirteen elements of 11 U.S.C. § 1129(a)." In re Genesis Health Ventures, Inc., 266 B.R. 591, 598-99 (Bankr. D. Del. 2000) (citing In re Gulfstar Indus., Inc., 236 B.R. 75, 77 (M.D. Fla. 1999). "Creditors [or other parties of interest] objecting to the proposed plan bear the burden of producing evidence to support their objection." Id. (citing In re

---

[2] Counsel for the Debtor-In-Possession objected to Mr. Baratz's testimony on rebuttal because the substance of his testimony was not contained in his submitted report. This Court has the discretion to allow testimony where it is not being offered in bad faith and is not prejudicial or surprising to the opponent. Since the Debtor-In-Possession provided testimony of its member regarding tax consequences, it should not be surprised by Wild Waves' offer in response and could have deposed Mr. Baratz prior to the hearing on this issue if it so desired. Moreover, tax consequences to the members, while of interest to them, would have little or no effect on the Debtor-In-Possession. See Meyers v. Pennypack Woods Home Ownership Association, 559 F.2d 894, 905 (3d Cir. 1977).

Shortridge, 65 F.3d 169, 1995 WL 518870 (6th Cir. 1995); In re Goddard, 212 B.R. 233, 239 n.7

(D.N.J. 1997)).

### A.    Plan Proponent

The Debtor-In-Possession argues that Wild Waves is not a party in interest entitled to file

a Chapter 11 Plan and that Wild Waves cannot establish such status until after the Claims

Estimation Hearing.  The Code provides that:

> Any party in interest, including the debtor, the trustee, a creditors'
> committee, an equity security holders' committee, a creditor, an
> equity security holder, or any indenture trustee, may file a plan if
> and only if—
>
> > (1)  a trustee has been appointed under this chapter;
> >
> > (2)  the debtor has not filed a plan before 120 days
> > after the date of the order for relief under this
> > chapter; or
> >
> > (3)  the debtor has not filed a plan that has been
> > accepted, before 180 days after the date of the order
> > for relief under this chapter, by each class of claims
> > or interests that is impaired under the plan.

11 U.S.C. § 1121(c).  The term "creditor" is defined as an "entity that has a claim against the

debtor that arose at the time of or before the order of relief concerning the debtor."  11 U.S.C.

§ 101(10)(A).  A "claim" is a "right to payment, whether or not such right is reduced to

judgment, liquidated, unliquidated, fixed, contingent, matured , unmatured, disputed, undisputed,

legal, equitable, secured, or unsecured."  11 U.S.C. § 101(5)(A).  In this Court's September 30,

2009 Opinion regarding the Claims Litigation, the Court found that the Debtor-In-Possession

breached the Lease by obstructing access to Wild Waves' Water Park.  Therefore, at a minimum,

Wild Waves has an unsecured claim and is a creditor of the Debtor-In-Possession.

A "party in interest, including the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee, may raise and may appear and be heard on any issue." 11 U.S.C. § 1109(b). Although "party in interest" is undefined by the Code, the term is not limited to the examples in § 1109(b). In re Amatex Corp., 755 F.2d 1034, 1042 (3d Cir. 1985). "[C]ourts must determine on a case by case basis whether the prospective party in interest has a sufficient stake in the proceeding so as to require representation." Id. If the court finds a sufficient stake, then the entity may be considered a party in interest. Id. at 1042-43.

Wild Waves is a tenant of the Debtor-In-Possession and is the proposed purchaser under the Sale Agreement. Both as a tenant and the proposed purchaser, Wild Waves has sufficient stake in the Debtor-In-Possession's case to be deemed a "party in interest." Thus, pursuant to § 1121(c), Wild Waves may file a Chapter 11 plan.

## B. Classification of Claims

The Debtor-In-Possession and members argue that Wild Waves as a general unsecured creditor should not be separated from the unsecured creditors of Class 4 and that such separation is gerrymandering. The Debtor-In-Possession and members assert that Wild Waves has classified itself separately from the other unsecured creditors solely to create an accepting impaired class. Wild Waves argues that the Plan's classification scheme meets the requirements of 11 U.S.C. § 1122 because the claims and equity interests in each class are substantially similar to other claims and equity interests in the same class and are also treated similarly. Additionally, Wild Waves contends that Wild Waves' separate classification from other unsecured creditors is not gerrymandering because Wild Waves has consented to treatment different from other unsecured creditors under the Plan.

14

11 U.S.C. § 1122 governs the classification of claims or interests within a Chapter 11 plan and provides that "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class." 11 U.S.C. § 1122(a). "One clear rule emerges" in the courts regarding "§1122 classification: thou shalt not classify similar claims differently in order to gerrymander an affirmative vote on a reorganization plan." In re Greystone III Joint Venture, 995 F.2d 1274, 1279 (5th Cir. 1991), cert. denied, 506 U.S. 821 (1992). The Third Circuit has found that "the grouping of similar claims in different classes" is permissible and that "the classification of claims or interests must be reasonable." 817 F.2d at 1060-61. In re Jersey City Med. Ctr., 817 F.2d 1055, 1060-61 (3d Cir. 1987). The Third Circuit has further outlined factors for determining whether a classification is reasonable and found that the separate classification of interests for the sole purpose of creating an impaired class is impermissible and "would simply constitute a method for circumventing the requirement set out in 11 U.S.C. § 1129(a)(10)." John Hancock Mutual Life Insurance Co. v. Route 37 Business Park Assoc., 987 F.2d 154, 159 (3d Cir. 1993).

Here, the classification scheme proposed by Wild Waves' Plan is permissible pursuant to the Code and reasonable under Third Circuit case law. Although Wild Waves' is a unsecured creditor, Wild Waves will not be treated the same. Wild Waves has agreed to subordinate its unsecured claim and receive payment after the unsecured creditors of Class 4 and the Plan Administrator Loan are paid in full. Creditors have the right to consent to less favorable treatment and Wild Waves has done so.

Moreover, the Debtor-In-Possession and members' argument that Wild Waves separately classified itself to create an accepting impaired class fails. Even if Wild Waves were to be classified in Class 4 and Wild Waves were to accept the Plan, Class 4 would then become an

accepting impaired class because Wild Waves' proof of claim far outweighs the other unsecured

creditors' claims of the Class; therefore, Wild Waves is not creating multiple classes in order to

mold the vote.

### C.    Assumption of the Sale Agreement

Although not raised prior to or at the confirmation hearing, both the Debtor-In-

Possession and the members contend in their post-confirmation hearing briefs that Wild Waves

as the plan proponent cannot assume the Sale Agreement as contemplated in its Plan because

only a trustee or debtor-in-possession has the right to do so pursuant to the Bankruptcy Code;

thus, the Plan is in violation of § 1129(a)(1).[3]  In response, Wild Waves argues that it is seeking

to assume the Sale Agreement through the Plan in a manner similar to the non-debtor plan

proponent of In re Dynamic Tooling Systems, Inc., 349 B.R. 847, 852 (Bankr. D. Kan. 2006),

and that the Court could compel the Debtor to carry out the purposed Plan.

11 U.S.C. § 1123(b)(2) provides that:

> (b)  Subject to subsection (a) of this section, a plan may–
>
> > (2)  subject to section 365 of this title, provide for
> > the assumption, rejection, or assignment of any
> > executory contract or unexpired lease of the debtor
> > not previously rejected under such section[.]

11 U.S.C. § 365(a) provides that "the trustee, subject to the court's approval, may assume or

reject any executory contract or unexpired lease of the debtor."  Because a DIP possesses all of

the rights and powers of a trustee pursuant to 11 U.S.C. § 1107(a), it would be authorized to

assume or reject under this provision.  However, there is an "absence of case law authority

---

[3]  11 U.S.C. § 1129(a)(1) provides that for the Court to confirm a plan, the Court must
find that "[t]he plan complies with the applicable provisions of this title."

concerning whether a creditor's plan proponent may provide for an estate representative to assume or reject an executory contract." Dynamic Tooling Systems, Inc., 349 B.R. at 852.

In Dynamic Tooling Systems, Inc., the bankruptcy court considered whether a non-debtor proponent's plan could provide for the appointment of an estate representative to assume or reject the debtor's executory contracts. 349 B.R. at 852-54. The bankruptcy court first concluded that the debtor's executory contracts were estate property pursuant to 11 U.S.C. § 541, and since 11 U.S.C. § 1123(a)(5) mandated that a Chapter 11 plan provide for the retention or transfer of property of the estate, which the non-debtor proponent's plan provided, the estate representative could assume or reject the executory contracts. Id. at 852. In the matter before this Court, as in Dynamic Tooling Systems, Inc., when a creditor files a plan that complies with the mandatory provisions of § 1123(a) and some of the provisions of § 1123(b), it follows that:

> If . . . a creditor-proponent could not provide in a plan for a plan representative to assume or reject executory contracts, the practical results would be nonsensical. Section 1123(b)(2) would have no meaning in connection with creditors' plans. A creditor proponent would either have to rely upon the debtor, its obvious adversary, to reject any unfavorable or burdensome contracts or the creditor would need to seek the appointment of a trustee in the case, triggering an additional layer of administrative expense and effort in order to propose a liquidation or other alternative to what the debtor has offered the creditor body. The tactical value of a creditor's right to file a plan under § 1121 would be diminished.

Id. at 852-53. The bankruptcy court distinguished its case from the reasoning of the United States Supreme Court in Hartford Underwriters Insurance Co. v. Union Planters Bank, N.A., 530 U.S. 1 (2000). While the United States Supreme Court has determined that only a trustee can recover under 11 U.S.C. § 506 (c) based on the plain meaning of that provision of the Code, the Court left open the question as to whether or not a bankruptcy court could authorize a party to act in the trustee's stead. Hartford Underwriters Insurance Co., 530 U.S. at 13 n.5. The

bankruptcy court found that, unlike the administrative claimant that asserted an independent

right under § 506(c) in Hartford Underwriters, the non-debtor plan proponent in Dynamic

Tooling Systems, Inc. had not asserted an independent right to assume or reject the debtor's

executory contracts but had requested confirmation of a plan that would "bestow upon them the

right to assume or reject [the debtor's] executory contracts." Dynamic Tooling Systems, Inc.,

349 B.R. at 853. Congress clearly intended for any party in interest to file a plan under

§ 1121(c), and it is essential that the proponent deal with the executory contracts within the plan

even though it would not have the right to do so outside of the scope of § 1123.

Here, the Plan provision is similar to the one proposed in Dynamic Tooling Systems, Inc.

The Plan proponent is proposing that this Court confirm a plan that bestows upon the Plan

Administrator the right to assume the Debtor-In-Possession's executory contracts, specifically,

the Sale Agreement. Wild Waves is not attempting to independently use the right to assume or

reject the Debtor-In-Possession's executory contracts but is seeking to provide in its Plan for the

retention or transfer of estate property as required by § 1123(a)(5). Therefore, this section of

Wild Waves' Plan is not violative of § 1129(a)(1), and the Plan Administrator may assume the

Lease and Sale Agreement.

### D.    Proposed Purchase Price for the Pier

Wild Waves contends that the purchase price under the Sale Agreement should be

adjusted based on insurance proceeds and settlements from litigation that the Debtor-In-

Possession has received from the first and second fire based on the theory of equitable ownership

and the holding in Larstan Industries, Inc. v. Res-Alia Holding Company, 232 A.2d 440, 443-44

(N.J. Super. Ct. App. Div. 1967). The Debtor-in-Possession and members contend that Wild

Waves' Plan has not been proposed in good faith because the proposed price reduction violates

New Jersey law, the insurance proceeds have been used for repairs to the Pier, and the Sale

Agreement provides for remedies if fire destruction occurs prior to closing.

The New Jersey Supreme Court has addressed the doctrine of equitable ownership, which

it describes as "a fiction devised to achieve justice between the parties to a real estate

transaction." Jock v. Zoning Board of Adjustment, 878 A.2d 785, 799-800. "The doctrine rests

on the principle that, as between parties to a contract, equity regards things as done that were

agreed to be done" and that the "contract itself is the key." Id. at 800. The doctrine will not be

used "where a contract provision specifically allocates the risk of loss between execution and

closing" and "is invoked to give effect to the mutual intent of the parties." Id.

Three provisions of the Sale Agreement pertain to the allocation of risk of loss and/or

the remedies for Wild Waves if such loss or damage occurs. In paragraph 12(a), the Sale

Agreement provides that "[t]he risk of loss or damage to the property by fire or otherwise,

excepting ordinary wear and tear, is on the Seller until the closing. If damage by fire shall

exceed ten percent (10%) of the purchase price, Buyer may cancel this Agreement." In

paragraph 21(d), the Sale Agreement provides that:

> Buyer reserves the right, at its sole discretion, to purchase the
> property irrespective of any breach of this Agreement by Seller,
> any failure of Seller to perform any of its duties or obligations
> under the agreement, any defect in title or any environmental or
> other deficiency in the property.

And, paragraph 21(e) of the Sale Agreement provides that:

> In the event of a fire that results in total destruction of the
> structures on the property, Buyer shall have the right to purchase
> the property at the value allocated the real estate in Paragraph 2(f)
> [sic].

Although paragraph 21(e) references paragraph 2(f), paragraph 2(e) is the last paragraph in 2

(and the obvious reference), and states that:

19

The total value of assets for purposes of this transaction is $5,500,000; allocated as follows:

| | |
|---|---|
| Real Estate | $2,000,000.00 |
| Buildings and Structures | $2,000,000.00 |
| Furniture, Fixtures & Equipment | $1,500,000.00 |

Pursuant to paragraph 12(a) of the Sale Agreement, the risk of loss remains with the Seller and Wild Waves has the right to cancel the Agreement.  Paragraph 21(d) grants Wild Waves the right to purchase the property at its discretion, if the Debtor-In-Possession fails to perform its obligations under the contract or if there are deficiencies in the property.  Read together, these provisions give Wild Waves alternative remedies under the contract.  There is no mention in paragraph 21(d) or elsewhere providing Wild Waves with a credit to the purchase price.  The doctrine of equitable ownership is not applicable.  Since the Sale Agreement addresses such loss, Wild Waves cannot reduce the purchase price by the amount of the insurance proceeds received by the Debtor-In-Possession under the doctrine of equitable ownership. Wild Waves and the Debtor-In-Possession agreed to these terms regarding risk of loss and remedies when they drew up the Sale Agreement, and the parties' mutual intent will be effectuated by adhering to such terms.  If the Debtor-In-Possession breached the Sale Agreement by not adding Wild Waves as an additional insured, Wild Waves may assert its breach of contract claim in the claims determination process.

Moreover, Wild Waves' argument regarding Larstan Industries, Inc. must fail because that case was not based on equitable ownership, but instead based on language in the contract. The Appellate Division held that the Tenant was entitled to exercise its option to purchase and receive credit for insurance proceeds received by the Landlord for the fire as provided for in the contract despite an allegation that it may have negligently caused the fire, in contrast to what may have been a more equitable result.  232 A.2d 440, 443-44 (N.J. Super. Ct. App. Div. 1967).

The court reasoned that "by virtue of the terms of the lease Larstan had an inchoate equitable interest in Res-Alia's insurance prior to the fire.  This interest became choate after the fire, even though Larstan was not named in the pplicies [sic] . . . and the fire was caused by Larstan's negligence, even if gross." Id. at 444.  Here, unlike Larstan Industries, Inc., the terms of the Sale Agreement do not provide for a reduction of the purchase price by the insurance proceeds received.

Because the Sale Agreement itself is the key pursuant to New Jersey law, the Plan cannot be confirmed with the purchase price proposed by Wild Waves.  Although paragraph 21(e) of the Sale Agreement establishes the purchase price in the event of the total destruction of the structures on the Pier, it is implicit in the Agreement that if substantial but not total destruction of structures on the Pier occurs, the purchase price could be calculated by providing evidence of the value of the remaining structures and contents in addition to the real estate value of $2 million.

### E.    Escrow Pursuant to the Amendment to the Lease

Wild Waves asserts that it will use $425,000 in escrow pursuant to the Amendment to the Lease to partially fund the closing.  The Debtor-In-Possession asserts that the Amendment to the Lease provides that Wild Waves was to pay $400,000 of "additional collateral"and that such collateral should remain in escrow for rental payments that become due and for the pre-petition default of rent, taxes, late fees, and pre-judgment interest.  Further, the Debtor-In-Possession argues that Wild Waves has not demonstrated any reason for this Court to vacate its July 10, 2006 Order, which provides that the $400,000 be paid by Wild Waves and held in Wild Waves' attorney's trust account until further order of the Court.  The Amendment to the Lease dated September 29, 1999 provides in pertinent part that:

> In consideration of Landlord permitting Tenant to encumber
> Landlord's entire premises in order to obtain financing for the
> construction of the water park and improvements, Tenant agrees to
> pay and Landlord agrees to accept the sum of $400,000.00 as
> additional collateral. . . .  The sums will be held by Nickels
> Midway Pier, L.L.C. for the purpose of curing any of the tenants
> defaults under the loan documents to be executed with Sun Bank.
> The sums will be held until the aforementioned second mortgage
> matures in approximately five years.  In the event the permitted
> second mortgage is paid off before its maturity date, the
> $400,000.00 or balance thereof will be used for rental payments as
> they become due.

The Addendum to the Lease dated October 14, 1999 modifies the Amendment as

follows:

> In the event Landlord sells the Leased Premises prior to the
> discharge of the Second Mortgage, Landlord shall return to Tenant
> on the date of Closing and/or receipt of proceeds of sale the
> $400,000 or balance thereof being held by Landlord pursuant to
> Amendment to Lease dated Sept. 29th 1999.

The Addendum to the Lease states that the Debtor-In-Possession must return the

$400,000 to Wild Waves on the date of closing or once the sale proceeds are received by the

Debtor if the Leased Premises is sold before the Sun Bank Mortgage is discharged.  If Wild

Waves assumes the Sale Agreement and closes as proposed by its Plan, the Court will order that

the escrowed funds be released to Wild Waves on the date of closing as contemplated by the

Addendum to the Lease since the sale of the Leased Premises will occur prior to the discharge of

the Sun Bank Mortgage.  Thus, the escrowed amount of approximately $425,000 will be

available to fund the Plan.

**F.     Third Party Releases**

Wild Waves contends in its Disclosure Statement that the proposed third party releases

are justified because Wild Waves will provide the funding for the Plan Administrator Loan and

is committed to waive such loan if funds are unavailable for repayment, and the creditors'

22

classes that would be affected by the releases are unimpaired under the Plan and thus are deemed

to have accepted the Plan.  Mr. Weiner testified that the releases were justified because there

needs to be an end to the litigation.  The Debtor-In-Possession and members argue that this is not

an extraordinary case, and that the releases are not fair, necessary to the reorganization, or given

in exchange for fair consideration.

Article IV.H. of Wild Waves' Plan, as modified orally at the confirmation hearing and set

forth in Wild Waves' modification filed on March 23, 2010, regarding "Releases" provides:

> Except for the Sun Bank Claims, effective as of the
> Effective Date, and except as otherwise provided in the Plan or the
> Confirmation Order, to the fullest extent permitted under
> applicable law, in consideration for the obligations of the Persons
> set forth below under the Plan and, if applicable, the Distributions,
> contracts, releases and other agreements or documents to be
> delivered in connection with the Plan, each holder of a Claim and
> each Equity Interest Holder and any affiliate of any such holder of
> a Claim or Equity Interest Holder (as well as any trustee or agent
> on behalf of each such holder of a Claim or Equity Interest Holder)
> shall be deemed to have forever waived, released and discharged
> (I) Wild Waves, the Plan Administrator and their respective
> members, officers, directors, employees, attorneys, accountants,
> financial advisors, and agents (but only in their capacity as such)
> from any and all claims, obligations, suits, judgments, damages,
> demands, debts, rights, Causes of Action and liabilities (other than
> the rights to enforce the Plan and the contracts, instruments,
> releases, indentures and other agreements or documents delivered
> thereunder), whether for tort, contract, violations of federal or state
> securities laws, or otherwise, whether liquidated or unliquidated,
> fixed or contingent, matured or unmatured, known or unknown,
> foreseen or unforeseen, then existing or thereafter arising, in law,
> equity or otherwise that are based in whole or part on any act,
> omission, transaction, event or other occurrence, except for willful
> misconduct or gross negligence, taking place on or prior to the
> Effective Date in any way relating to Wild Waves, the Plan
> Administrator or the Plan, except for issues in the Claims
> Litigation and the Fire Litigation.

11 U.S.C. § 524(e) provides that "discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt." The language of § 524(e) "only provides that a discharge of the debtor does not affect the liability of non-debtors on claims by third parties against them for the debt discharged in bankruptcy." In re PWS Holding Corp., 228 F.3d 224, 245 (3d Cir. 2000). Although the Third Circuit has not established its "own rule regarding the conditions under which non-debtor releases and permanent injunctions are appropriate or permissible," it did recognize that "fairness, necessity to the reorganization, and specific factual findings to support these conclusions" are "the hallmarks of permissible non-consensual releases." Gillman v. Continental Airlines, 203 F.3d 203, 214 (3d Cir. 2000). To determine whether or not the releases are necessary to the reorganization, the plan's proponent must demonstrate that there is a relationship between the debtors' successful reorganization and the non-consensual parties' release, and that "the releasees have provided a critical financial contribution to the debtors' plan that is necessary to make the plan feasible in exchange for receiving a release of liability." Genesis Health, 266 B.R. at 608. To determine fairness, the issue is "whether non-consenting creditors were given reasonable consideration in exchange for the release." Genesis Health, 266 B.R. at 608.

Here, the Plan's proposed third party release language is impermissible as it is not necessary to the reorganization and has not been given in exchange for fair consideration thus violating § 1129(a)(1). Wild Waves has not demonstrated that the success of the Debtor-In-Possession's reorganization bears a relationship to the release of the non-consensual parties. The Plan provides for liquidation, which can be successfully accomplished whether or not Wild Waves is released from third parties' claims. Additionally, while Wild Waves is providing the Plan Administrator Loan, which has an interest rate of 10% per annum and is to be repaid before

distributions to Classes 4 or 5, it is not an investment of capital.  Although risk of non-repayment

of the loan is evident and the goal of finality is desirable, it is not necessary to the success of

reorganization.

Finally, as to whether non-consenting creditors were given reasonable consideration in

exchange for the release, although the Plan is consensual according to the terms of Chapter 11

provisions, the Debtor-In-Possession and members object to such release.  There has been no

consideration given to members who are specifically subject to its provisions in exchange for the

release.  Wild Waves is not giving the Debtor-In-Possession, members, or third parties mutual

releases nor are they giving the third parties monetary consideration.  The Plan will pay claims to

creditors but not to the third party releasors.  The Plan Administrator Loan does not create

consideration for the release of other claims such third parties may be entitled to pursue.  Even

with the addition of the "except for willful misconduct or gross negligence" language, the broad

release found in Article IV.H. is not permissible.

## G.   Exculpation Clause

Wild Waves contends that the exculpation language in the Plan mirrors the exculpation

language approved by the Third Circuit in In re PWS Holding Corp., 228 F.3d 224, 246 (3d Cir.

2000).  The Debtor-In-Possession and the members did not distinguish between the exculpation

clause and the releases discussed above, asserting the same arguments for both sections of the

Plan.  Article IV.G. of Wild Waves' Plan, entitled "Exculpation," provides that:

> Wild Waves, the Plan Administrator, and their respective
> members, officers, directors, employees, attorneys, accountants,
> financial advisors, and agents (but only in their capacity as such)
> shall not have, or incur, any liability to any holder of a Claim
> (except for any and all claims of Sun Bank against Wild Waves,
> Weiner, Jay Petkov (Petkov") and/or Byron K. Schader
> ("Schader"), including but not limited to, those arising out of, or
> pertaining or relating to, that certain October 26, 1999 Promissory

25

> Note executed and delivered by Wild Waves to Sun Bank in the
> original principal amount of $2,800,000.00, the Sun Bank
> Mortgage (defined hereinabove), that certain October 26, 1999
> Unconditional Guaranty executed and delivered by Weiner to Sun
> Bank, that certain October 26, 1999 Unconditional Guaranty
> executed and delivered by Petkov to Sun Bank, that certain
> October 26, 1999 Unconditional Guaranty executed and delivered
> by Schader to Sun Bank and any and all other documents executed
> and/or delivered in connection with, or pertaining to, any or all of
> the foregoing, including any and all modifications of and/or
> extensions to any or all of the foregoing (the "Sun Bank Claims"),
> the Claims Litigation and the Fire Litigation) or Equity Interest
> Holder for any act or omission in connection with, related to, or
> arising out of, the Chapter 11 Case, the pursuit of confirmation of
> the Plan, the consummation of the Plan or the Plan Administrator
> or the property of the Estate, except for willful misconduct or gross
> negligence, and, in all respects, Wild Waves, the Plan
> Administrator, and their respective members, officers, directors,
> employees, attorneys, financial advisors, and agents shall be
> entitled to rely upon the advise of counsel with respect to their
> duties and responsibilities under the Plan.

The Third Circuit has found exculpation language that limits claims "to claims brought in

connection with work on the bankruptcy reorganization plan" and "does not eliminate liability

but rather limits it to willful misconduct or gross negligence" is permissible in a Chapter 11 plan.

PWS Holding Corp., 228 F.3d at 235.  Such a Chapter 11 plan provision "does not affect the

liability of these parties, but rather states the standard of liability under the Code, and thus does

not come within the meaning of § 524(e)."  Id. at 245.  Here, the exculpation language of Wild

Waves' Plan is permissible because it mirrors the language of the exculpation clause approved

by the Third Circuit in PWS Holding Corp..

### H.    Assignment of Debtor's Interests to Members

Wild Waves' Plan grants the members the Debtor-In-Possession's rights to prosecute the Claims Litigation and Fire Litigation against Wild Waves because, Wild Waves contends that the members are the only parties who would benefit from such litigation since the Debtor-In-Possession's other creditors will be satisfied under the Plan.  Further, Wild Waves argues that the members are in the best position to determine the value of the Claims Litigation and the Fire Litigation and whether or not such litigation should continue to be pursued. The members argue that it is not fair and equitable that Wild Waves' Plan attempts to impose upon the members the costs of prosecuting and defending the Claims Litigation.  11 U.S.C. § 1123(a)(5) provides that:

> (a)    Notwithstanding any otherwise applicable nonbankruptcy law, a plan shall–
>
> (5)  provide adequate means for the plan's implementation, such as–
>
> > (B) transfer of all or any part of the property of the estate to one or more entities, whether organized before or after the confirmation of such plan[.]

Here, since Wild Waves' Plan satisfies the Debtor-In-Possession's creditors, the members are the only parties who would benefit from the continuation of the claims litigation and fire litigation.  Pursuant to § 1123(a)(5)(B), the Plan Administrator can assign property of the estate, such as the Debtor-In-Possession's right to pursue causes of action, to another entity.  The members have not cited any bankruptcy or nonbankruptcy law that prohibits this assignment. The members are not compelled to accept the assignment if the Debtor-In-Possession's interests in the claims litigation and fire litigation are a burden to them.  The term "fair and equitable" as defined in § 1129(b)(2) is not affected by this Plan provision.

### I.    11 U.S.C. 1129(a)(9).

Wild Waves contends that the Plan provides for payment of all allowed administrative

expenses and priority tax claims and that the Plan provides for the Plan Administrator Loan to

ensure payment of allowed administrative claims.  The Debtor-In-Possession and members argue

that the Plan must demonstrate that payment of all administrative expenses is feasible and

provide for payment of the approved unpaid fees on the effective date of the Plan.  Pursuant to

11 U.S.C. § 1129(a)(9), before the Court can confirm a plan, it must find that:

> Except to the extent that the holder of a particular claim has agreed
> to a different treatment of such claim, the plan provides that–
>
> > (A) with respect to a claim of a kind specified in
> > section 507(a)(2) or 507(a)(3) of this title, on the
> > effective date of the plan, the holder of such claim
> > will receive on account of such claim cash equal to
> > the allowed amount of such claim[.]

With a proper purchase price for the Pier and the Plan Administrator Loan provided for in the

Plan, administrative expenses claims are contemplated to be paid in accordance with the Code;

therefore, the Court finds that Wild Waves has satisfied the requirements of § 1129(a)(9).  The

issue of feasibility is addressed in section M. of this Opinion.

### J.    Appointment of Plan Administrator

Wild Waves asserts that Mr. Weiner, the managing member of Wild Waves, can be

appointed Plan Administrator as proposed by the Plan pursuant to the Code and that it is

common for creditors with large claims or creditor's committee representatives to be chosen for

such roles because they are the parties that will be affected by a plan administrator's actions.

Additionally, Wild Waves asserts that the Plan discloses that the members will control the

Debtor-In-Possession's operations left in existence and that the claims litigation and fire

litigation will be assigned to the members.  The Debtor-In-Possession contends that the

appointment of Mr. Weiner as Plan Administrator is not consistent with creditors' and members'

interests and with public policy because Mr. Weiner has a conflict of interest since Wild Waves

will continue to be an adversary in litigation against the Debtor-In-Possession.

11 U.S.C. § 1123(b)(3)(B) provides that:

> (b)     Subject to subsection (a) of this section, a plan may–
> (3) provide for–
>
> > (B) the retention and enforcement by
> > the debtor, by the trustee, or by a
> > representative of the estate appointed
> > for such purpose, of any such claim
> > or interest[.]

11 U.S.C. § 1129(a)(5) provides in pertinent part that to confirm a Chapter 11 Plan a court must

find that:

> (5)(A)(I) The proponent of the plan has disclosed the identity and
> affiliations of any individual proposed to serve, after confirmation
> of the plan, as a director, officer, or voting trustee of the debtor, an
> affiliate of the debtor participating in a joint plan with the debtor,
> or a successor to the debtor under the plan; and
>
> > (ii) the appointment to, or continuance in, such
> > office of such individual, is consistent with the
> > interests of creditors and equity security holders and
> > with public policy; and
>
> (B) the proponent of the plan has disclosed the identity of any
> insider that will be employed or retained by the reorganized
> debtor, and the nature of any compensation for such insider.

Here, pursuant to § 1123(b)(3)(B), the Plan provides for a Plan Administrator,

Mr. Weiner, to facilitate the liquidation of the Debtor-In-Possession.  The Plan discloses

Mr. Weiner as the Plan Administrator and the members as managers of the Debtor-In-

Possession's operations.  Mr. Weiner is not an insider as defined by the Code, and the identities

of the insiders, the members, have been disclosed.  Since the Plan discloses the appropriate

information, and evidence has not been presented to suggest Mr. Weiner's appointment would be inconsistent with the interests of creditors, members, and with public policy, the appointment of Mr. Weiner as Plan Administrator is not in violation of § 1129(a)(5).

### K.    11 U.S.C. § 1129(a)(4)

The Debtor-In-Possession and members argue that the Plan violates § 1129(a)(4) because the Plan proposes to pay the Plan Administrator's Professionals from proceeds of the sale of the Pier and Small Property without Court approval or notice to parties of the payments or payment amounts.

11 U.S.C. § 1129(a)(4) provides for plan confirmation when:

> Any payment made or to be made by the proponent, by the debtor, or by a person issuing securities or acquiring property under the plan, for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the court as reasonable.

Article III.D.4.a. of the Plan has been modified to provide that:

> The Plan Administrator will provide fee statements to the United States Trustee and other parties in interest that request notice. If no objections are filed, on ten days notice, the Plan Administrator shall be deemed authorized to pay such fees. If objections are filed and cannot be resolved by the parties, the Court will schedule a hearing to consider such fees.

Wild Waves' Plan allows for Court supervision over the fees paid by the Plan Administrator for himself and his retained professionals. The modification should resolve this issue and complies with the Bankruptcy Code.

L.    **Effective Date of the Plan**

The Debtor-In-Possession and members asserted that the Plan did not provide for a true

effective date because the Plan may never become effective pursuant to the Plan's definition of

"effective date." Article II.B.28 of the Plan, as modified, provides that:

> Effective date means the date which is the later of: (a) ten days
> after entry of the Confirmation Order (unless waived by Wild
> Waves), (b) the date the Plan Administrator executes the Plan
> Administrator Agreement; and (c) the date of Closing, but in no
> event shall the Effective Date be later than 90 days after the
> Confirmation Order becomes a Final Order.

The modification should resolve this issue and provides a definite effective date.

M.    **11 U.S.C. § 1129(a)(11)**

Wild Waves argues that the Plan is feasible because Wild Waves will have and has

demonstrated that it will have the necessary funds to close on the sale of the Pier under the Sale

Agreement on the effective date. Wild Waves further argues that even if the Court allows a

purchase price above the price calculated by Wild Waves, Wild Waves will still be able to

establish that it has sufficient funds to close on the Pier and pay all other payments required by

the Plan. The Debtor-In-Possession and members contend that Wild Waves has not established

that the Plan is feasible because resources that Wild Waves proposes to utilize for funding will

not be available on the effective date, and the evidence presented is insufficient to meet the

requirements of 11 U.S.C. § 1129 (a)(11).

11 U.S.C. § 1129(a)(11) mandates a plan's proponent must demonstrate that

"[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further

financial reorganization, of the debtor or any successor to the debtor under the plan, unless such

liquidation or reorganization is proposed in the plan." The requirement of § 1129(a)(11) is met

"so long as there is a reasonable prospect for success and a reasonable assurance that the

proponents can comply with the terms of the plan. . . ." In re Sea Garden Motel and Apartments, 195 B.R. 294, 305 (D.N.J. 1996) (quoting In re Eddington Thread Mfg. Co., Inc., 181 B.R. 826, 832-33 (Bankr. E.D. Pa. 1995)).  A feasibility determination "is peculiarly fact intensive and requires a case by case analysis" and "a relatively low threshold of proof" satisfies the requirement. Id.

Here, since this is a liquidating plan, the main focus of the feasibility analysis pertains to whether or not Wild Waves will have sufficient resources to fund the Plan.  Mr. Weiner testified that the funds available for the Plan total approximately $2,040,000, including the $425,000 escrowed by Wild Waves in accordance with the amendment to the lease.  Accepting the members' assertion that $1,937,000.00 is required to satisfy administrative expense claims, NCM Mortgage, and unsecured creditors, the Plan would be feasible.  However, since the Court has determined that the Plan's proposed purchase price must increase, if Wild Waves files a modified plan, it will need to establish that it has the ability to provide the additional funding.

### N.    11 U.S.C. § 1129(a)(8)

Wild Waves contends that the only impaired class, itself, has voted in favor of confirmation, therefore, the requirements of 11 U.S.C. § 1129(a)(8) are satisfied.  Wild Waves asserts that members are not impaired under the Plan since they will retain their equity interests and will receive any funds remaining in the estate after payment of allowed administrative expenses, allowed claims in Classes 1 through Class 5, and repayment of the Plan Administrator Loan.  Further, Wild Waves argues that even if the members were impaired, the Plan could still be confirmed through a cram down because the Plan is fair and equitable as defined by the Code. The members assert that Class 6, the members' class, is impaired under Wild Waves' Plan because, although the Plan provides for the members to retain their equity interest after the

32

liquidation of the Debtor-In-Possession's assets, they will be liable for the tax consequences of

the liquidation.  Additionally, the members argue that the liquidation  is unnecessary, and the

members will be impaired because they will have no control of the Debtor-In-Possession's assets

or operations.

　　　11 U.S.C. § 1129(a)(8)(B) provides that in order for a court to confirm a plan, the plan

must meet the requirement that "[w]ith respect to each class of claims or interests – (A) such

class has accepted the plan; or (B) such class is not impaired under the plan." 11 U.S.C.

§ 1124(1) provides that:

> Except as provided in section 1123(a)(4) of this title, a class of
> claims or interests is impaired under a plan unless, with respect to
> each claim or interest of such class, the plan –
>
> > (1)  leaves unaltered the legal, equitable, and
> > contractual rights to which such claim or interest
> > entitles the holder of such claim or interest[.]

11 U.S.C. § 1126(f) provides that:

> Notwithstanding any other provision of this section, a class that is
> not impaired under a plan, and each holder of a claim or interest of
> such class, are conclusively presumed to have accepted the plan,
> and solicitation of acceptances with respect to such class from the
> holders of claims or interests of such class is not required.

In determining if a plan impairs a class of interests, "a creditor's claim outside of bankruptcy is

not the relevant barometer for impairment; we must examine whether the plan itself is a source

of limitation on a creditor's legal, equitable, or contractual rights." In re PPI Enterprises, Inc.,

324 F.3d 197, 204 (3d Cir. 2003).

　　　Section 1129 provides two ways for a proposed Chapter 11 plan to be confirmed.  "The

first requires approval by all impaired classes." John Hancock Mut. Life Ins. Co. v. Route 37

Bus. Park Assoc., 987 F.2d 154, 157 (3d Cir. 1993).  Even if the plan is not accepted by all

impaired classes as required by section 1129(a)(8), a court may still confirm the plan if it meets

the other § 1129(a) requirements, including the requirement that the plan be accepted by at least

one impaired creditors' class pursuant to 11 U.S.C. § 1129(a)(10), and the requirements of

§ 1129(b). This is referred to as a "'cram down,' as the court can cram a plan down over the

objection of an impaired class." In re Armstrong World Indus., Inc., 432 F.3d 507, 511-12 (3d

Cir. 2005). The "fair and equitable" requirement of § 1129(b), "invokes the absolute priority

rule." Id. As codified in § 1129(b)(2)(B)(ii), the absolute priority rule requires that "a dissenting

class of unsecured creditors must be provided for in full before any junior class can receive or

retain any property [under a reorganization] plan." Norwest Bank Worthington v. Ahlers, 485

U.S. 197, 202 (1988).

Here, it does not appear that any class would be impaired under Wild Waves' Plan

pursuant to § 1124(1), and thus, the classes are deemed to have accepted the Plan pursuant to

§ 1126(f). Therefore, the Plan is a consensual Plan pursuant to § 1129(a)(8). Even if the

members were found to be impaired, once the third party releases are removed and a  purchase

price is properly calculated, the Plan would still be confirmable pursuant to § 1129(b). Because

Wild Waves would vote in favor as an impaired unsecured class, the requirement of

§ 1129(a)(10) would be met. Further, the Plan's distribution scheme complies with the absolute

priority rule since no junior class is receiving or retaining property before the full payment of

any superior class. Therefore, the Plan would be confirmable under § 1129(b).

O.    **Termination of the Tenant's Leases**

Wild Waves argues that, under New Jersey law, the tenants' leases are subject to Wild

Waves' right to purchase the Pier because Wild Waves filed a lis pendens notice or because the

tenants had actual knowledge of the litigation between the Debtor-In-Possession and Wild

Waves; therefore, Wild Waves asserts it can terminate the leases and evict the tenants because they signed the leases subject to Wild Waves' interest. The tenants assert that Wild Waves' Plan seeks to breach the tenants' Leases, thus giving rise to claims for damages. The tenants argue that there is no law that waives the tenants' breach claims solely because of the tenants' knowledge of the litigation between Wild Waves and the Debtor.

Wild Waves failed to present evidence of the existence and validity of a <u>lis</u> <u>pendens</u> in support of its position nor has it provided sufficient evidence of actual notice nor legal support for its position that actual notice, in the absence of a filed valid <u>lis</u> <u>pendens</u>, is a permissible basis to terminate the leases by way of this Plan of Liquidation.

If Wild Waves ultimately acquires the Pier though this Plan or otherwise, it can satisfy its state law rights through state court proceedings or await conclusion of the leases at the end of the 2010 season. To the extent the Debtor-In-Possession breached provisions of the Sale Agreement by entering into, renewing or renegotiating leases without Wild Waves' consent, it can seek damages for such breach as an element of its damage claim.

### P.    The Gormley Mortgage

Maryann Gormley, mortgagee of the small property, objected to her treatment under the Plan. Mr. Weiner addressed this objection by explaining that monthly mortgage payments would be made until sale of the real estate and because the Plan does not alter Maryann Gormley's legal, equitable, or contractual rights, the objection by Maryann Gormley is overruled.

### Q.    Plan's Compliance with 11 U.S.C. § 1129(a)(3)

The Debtor-In-Possession and members argue that Wild Waves has not established that the Plan has been proposed in good faith. Wild Waves contends that it filed its Plan in good

35

faith and that the Plan provides the opportunity for creditors to receive full payment of their

claims and for the Debtor-In-Possession's Chapter 11 to come to conclusion.

As a requirement for confirming a plan under Chapter 11, section 1129(a)(3) provides

that a court must find that "the plan has been proposed in good faith and not by any means

forbidden by law." 11 U.S.C. § 1129(a)(3). "Good Faith" is not defined by the Code "in the

context of §1129(a)(3)." In re Combustion Engineering, Inc., 391 F.3d 190, 246 (3d Cir. 2004).

The Third Circuit has stated that "'[f]or purposes of determining good faith under section

1129(a)(3) . . . the important point of inquiry is the plan itself and whether such a plan will fairly

achieve a result consistent with the objectives and purposes of the Bankruptcy Code.'" PWS

Holding Corp., 228 F.3d at 242 (citing In re Abbotts Dairies of Pa., Inc., 788 F.2d 143, 150 n.5

(3d Cir. 1986)). "A good faith determination must be a fact-intensive, case-by-case inquiry." In

re PPI Enterprises (U.S.), Inc., 324 F.3d 197, 211 (3d Cir. 2003).

After reviewing Wild Waves' Plan in its entirety and considering the evidence presented,

the Court finds that the Plan has been proposed in good faith. Wild Waves has waited for a

lengthy period of time to purchase the Pier under the Sale Agreement and has been embroiled in

litigation with the Debtor-In-Possession since before the Debtor-In-Possession's bankruptcy

filing in December of 2003. Wild Waves has invested time, money, and energy into the Pier and

the bankruptcy process. The Plan provides for the end of litigation and the sale of the Pier, and

proposes to satisfy all secured and unsecured creditors which is consistent with the objectives

and purposes of the Bankruptcy Code. Although this Plan is not confirmable without

modification, the Court finds that the Plan has been proposed in good faith.

## IV.    CONCLUSION

After considering the testimony of the witnesses, the evidence presented, and the arguments of counsel, for the reasons set forth in this Opinion, the Court concludes that Wild Waves' Plan is not confirmable because the third party releases contained within violate § 1129(a)(1), there is no basis to terminate the tenants' leases, and the proposed purchase price for the Pier is not sufficient.  Wild Waves may present a modified plan to the Court in accordance with this decision if it so desires.

Counsel for Wild Waves should submit an Order to the Court in accordance with this decision.

BY THE COURT:

GLORIA M. BURNS
United States Bankruptcy Judge

Dated:  May 21, 2010